Michael **KRAUSE**, Plaintiff–Appellee,

v.

**R.O. BENNETT, Jr.,**
**Defendant–Appellant.**

No. 1087, Docket 89–7034.

United States Court of Appeals,
Second Circuit.

Argued April 27, 1989.

Decided Sept. 20, 1989.

As Amended Nov. 1, 1989.

Michael S. Buskus, Asst. Atty. Gen., State of N.Y., Albany, N.Y. (Robert Abrams, Atty. Gen. of the State of N.Y., Peter H. Schiff, Deputy Sol. Gen., Peter J. Dooley, Asst. Atty. Gen., State of N.Y., Albany, N.Y., of counsel), for defendant-appellant.

Donald J. Shanley, Troy, N.Y. (Shanley & Shanley, Troy, N.Y., of counsel), for plaintiff-appellee.

Before OAKES, Chief Judge, and TIMBERS and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Northern District of New York, Cholakis, J. Plaintiff-appellee Krause filed this action under 42 U.S.C. § 1983 (1982), alleging that defendant-appellant Bennett, a New York state trooper, had violated his constitutional rights during the course of events leading up to, and including, Bennett's arrest of Krause on a charge of possession of

stolen property. Krause contended that Bennett's arrest of him was in retaliation for a suit that Krause had previously brought against another state trooper. *See Krause v. Penny,* 837 F.2d 595 (2d Cir. 1988). The jury found against Bennett, and awarded Krause $1,800 compensatory and $25,000 punitive damages on his claim. The district court entered judgment in favor of Krause. Bennett moved for judgment notwithstanding the verdict, Fed.R. Civ.P. 50(b), a new trial, Fed.R.Civ.P. 59(a)(1), and alteration or amendment of the judgment, Fed.R.Civ.P. 59(e). The district court denied these post-trial motions, except that it ordered a new trial if Krause did not accept a reduction in the punitive damages award to $2,500. Krause accepted the reduction. Bennett appeals.

On appeal, Bennett contends that the district court erred in allowing the jury to consider whether a reasonable police officer would have believed probable cause existed to arrest Krause, the decisive factor in the analysis of qualified immunity in this case. According to Bennett, the district court should have held, as a matter of law, that he was entitled to qualified immunity.

We agree, and therefore we vacate the judgment and remand to the district court with instructions to dismiss the action.

## BACKGROUND

This suit was instituted in 1985 by Krause, and is based solely on alleged violations of 42 U.S.C. § 1983. For the purposes of this appeal, we view the facts in the light most favorable to Krause, the opponent of the motions denied by the district court.

In 1982, Krause was arrested by State Trooper Penny and Deputy Sheriff Rooney, on a charge of harassment. This arrest resulted in Krause suing both officers; Krause's suit, *Krause v. Penny,* was pending at the time of the events at issue in the current suit.

In 1984, Krause owned and resided in a home on Vosburg Road in Halfmoon, New York. This home had its main entryway through a kitchen door located inside a garage attached to the house. On March 4, 1984, Krause, who was in his kitchen with a friend, heard his dog barking and looked out the window. He saw Bennett in his garage approaching his kitchen door.

Upon seeing Bennett, Krause opened the kitchen door and asked Bennett why he was there. Bennett replied that he was investigating the sign that Krause had hung in his garage, indicating the stop sign on the garage's back wall. According to Bennett, his attention had been directed to the sign when he saw a reflection from it as he travelled down Vosburg Road, 80 feet from Krause's home. Bennett proceeded to question Krause about the sign, and Krause told Bennett that he had obtained it from a friend for whom he had done some plumbing work. Krause also told Bennett that this friend was named Bing Miller, and that Miller had found the sign in his own house when he bought it.

Because Krause was concerned about Bennett's questioning, he invited the trooper into his home while he looked for Miller's phone number, so that Bennett could verify Krause's story. Miller's name was not listed in the phone book under his nickname "Bing," however, and so Krause gave Bennett no further information. Krause and Bennett returned to the garage, where Bennett asked permission to examine the sign. Krause removed it from the wall for Bennett. The examination showed numbers and letters on the back of the sign, apparently painted on with a finger. The complete inscription was "90 M 11/14/66."

At this point, Bennett told Krause that the sign was stolen property. Krause disavowed knowledge of any prior theft of the sign and assured Bennett that he would obtain Miller's phone number so that Bennett could check out his story. That evening, Krause did find Miller's phone number and the next day he telephoned Bennett and gave him Miller's phone number and address. Nevertheless, when Krause called Bennett two days later, Bennett told Krause that he had not contacted Miller. At this time, Bennett informed Krause that

he could be prosecuted for possession of the stop sign.

Although Bennett had not contacted Miller, he had ascertained that the stop sign was owned by Saratoga County and had been missing since at least May 15, 1967. Upon receiving this information, Bennett telephoned a New York State Assistant District Attorney (A.D.A.), Robert Chauvin. He told Chauvin that he had discovered a stolen traffic sign in Krause's garage and that Krause had acknowledged that it was in his possession. Nevertheless, A.D.A. Chauvin did not recall whether Bennett had told him that Krause claimed he had been given the sign by Bing Miller. Based on the information presented to him, Chauvin advised Bennett that he should proceed with the prosecution of Krause.

Bennett obtained a deposition from a Saratoga County employee stating that the sign had been stolen from Saratoga County, and with that and an information he had prepared and signed himself, Bennett applied for a warrant to arrest Krause on a charge of possession of stolen property.

The information filed by Bennett read, in pertinent part:

Defendant[ ] did ... knowingly ... and unlawfully, ... commit the misdemeanor of criminal possession of stolen property 3rd ... To Wit: the said defendant on the above date and time was in possession of a traffic STOP sign located hanging inside of the garage area of the defendant's residence located on Vosburg[ ] Rd. The sign being visible from Vosburg[ ] Rd. The STOP sign had an ID number of 90 M 11/14/66 and was identified as the property of the Saratoga Co. Hwy. Dept. and was also listed as vandalized (stolen)[.] The defendant made

an oral statement that he had this sign for about three or four years and did not attempt to notify the owner.[ ] The defendant also stated he received this sign from a friend.

On the basis of this information and the accompanying deposition, a town justice of Halfmoon executed a warrant for the arrest of Krause. On Saturday, March 17, 1984, Bennett returned to Krause's home and arrested him.

The charges against Krause were dismissed in August 1984 for insufficiency of the evidence; documents included in the record of this appeal indicate that this assessment was based on a statute of limitations argument.[1] In January 1985, Krause filed the instant action in the Northern District of New York, alleging that Bennett was liable for damages under 42 U.S.C. § 1983 for violations of Krause's constitutional rights.

Krause's amended complaint stated five counts against Bennett. First, Krause alleged that Bennett entered his house without probable cause and without consent and then conducted an unconstitutional, warrantless search of the house, from which he seized the stop sign. Second, Krause alleged that Bennett deprived Krause of his constitutional right to liberty by procuring an arrest warrant and then arresting Krause when probable cause did not exist to arrest him. Krause's third claim was that Bennett's prosecution of him was malicious and without probable cause, thereby depriving him of his constitutional rights. The fourth claim was that Bennett arrested Krause in retaliation for Krause's suit against Penny, and that this was also a violation of Krause's constitutional rights. Finally, Krause alleged that

1. Krause argued that because the sign had been stolen seventeen years before he was arrested and because the information charged that he had been in possession of the sign for "three or four years" before he was arrested, he could no longer be prosecuted for possession of stolen property, as the statute of limitations was two years, and had run out. The A.D.A. who prosecuted the case agreed with Krause, and the charge was dismissed. We are not presented with the question whether this analysis was correct, but we note that the issue was discussed

during the course of the proceedings below, and that it is not clear that Krause and the A.D.A. are correct. Although New York has apparently not decided the issue, cases in other jurisdictions indicate that possession of stolen property can be considered a continuing offense, and thus the statute of limitations does not start to run until possession is relinquished. *See, e.g., State v. Lawrence,* 312 N.W.2d 251, 253 (Minn. 1981); *see also State v. White,* 322 N.C. 770, 778, 370 S.E.2d 390, 395, *cert. denied,* — U.S. —, 109 S.Ct. 399, 102 L.Ed.2d 387 (1988).

Bennett negligently deprived Krause of his constitutional rights by submitting factually deficient depositions to the town justice who executed the arrest warrant, also in violation of Krause's constitutional rights. Krause requested compensatory damages of $2.5 million and punitive damages of $500,000, along with attorney's fees under 42 U.S.C. § 1988 (1982).

At numerous junctures before, during and after the trial, defendant contended that he was immune from suit under *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). These instances included his pre-trial memorandum, a motion for directed verdict, a motion for judgment n.o.v., and letters to the court stating that defendant believed he was entitled to immunity and that this matter should be decided by the court, but that if the court was going to submit the matter to the jury, he would propose a verdict form to be used by the jury.

A jury trial was held in March 1987. The jury found against Bennett, and awarded Krause $1,800 compensatory and $25,000 punitive damages. The jury's sole basis for finding liability was their answer of "No" to the following question on the special verdict form: "Would a reasonably competent police officer have concluded that there was probable cause to believe that the plaintiff had committed the crime of 'Criminal Possession of Stolen Property'?" Bennett did not object to the inclusion of this question on the special verdict form, nor did he object to any part of the charge on the issue of immunity. Judgment was thereafter entered on March 20, 1987.

█ Following the entry of judgment, Bennett moved for j.n.o.v., a new trial or amendment of the judgment to reduce the punitive damage award. The district court denied the motions for j.n.o.v. and amendment of the judgment, but granted the motion for a new trial if Krause did not agree to a remittitur reducing the punitive damages award to $2,500. Krause agreed to the remittitur, and Bennett appealed from the district court's order.[2]

### DISCUSSION

Bennett argues that the district court erred in denying him judgment n.o.v. To support this, he asserts that he was qualifiedly immune from suit and that the district court should have held as a matter of law that a reasonable police officer could

---

**2.** Bennett's notice of appeal states that the appeal is taken "from the final judgment entered in this action on the 14th day of November, 1988." However, the judgment in this case was entered on March 20, 1987, after the jury verdict was rendered. It was Judge Cholakis' memorandum decision and order on Bennett's post-trial motions that was entered on November 14, 1988. The notice of appeal is thus technically inaccurate in its description of the decision from which an appeal is taken. Nevertheless, it is clear that Bennett intends to appeal from the judgment entered in March 1987. We therefore treat the notice of appeal as an appeal from that judgment. *See Matarese v. LeFevre*, 801 F.2d 98, 105 (2d Cir.1986), *cert. denied*, 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987). In conjunction with the review of the judgment, we review the denial of Bennett's Rule 50 motion for j.n.o.v. *See Grubb v. Federal Deposit Ins. Corp.*, 868 F.2d 1151, 1154 n. 4 (10th Cir.1989); *Serzysko v. Chase Manhattan Bank*, 461 F.2d 699, 701 (2d Cir.) (per curiam) (Rule 59 motion for new trial), *cert. denied*, 409 U.S. 883, 93 S.Ct. 173, 34 L.Ed.2d 139 (1972); 5A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 50.16 (2d ed. 1989).

Even if the notice of appeal could only be construed as an appeal from the order entered in November 1988, that would not be fatal to our jurisdiction. Krause has responded in full to Bennett's arguments and has not been prejudiced in any way by the inaccuracy in the notice of appeal. The failure to mention an earlier judgment in a notice of appeal that instead cites an order denying a motion for new trial, amendment of judgment or j.n.o.v. is not fatal under these circumstances. *See Mallis v. Bankers Trust Co.*, 717 F.2d 683, 692–93 (2d Cir.1983); *Wheatley v. Beetar*, 637 F.2d 863, 864 n. 1 (2d Cir.1980); *see also Grubb*, 868 F.2d at 1154 n. 4; *Taylor v. United States*, 848 F.2d 715, 717–18 (6th Cir.1988); *Bello v. Walker*, 840 F.2d 1124, 1131 (3d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 134, 176, 102 L.Ed.2d 107 (1988); *McCarthy v. Mayo*, 827 F.2d 1310, 1314 (9th Cir.1987); *Wyden v. Commissioner of Patents and Trademarks*, 807 F.2d 934, 937 (Fed.Cir.1986); *Johnson v. University of Wisconsin–Milwaukee*, 783 F.2d 59, 61 (7th Cir.1986); *cf. Bankers Trust Co. v. Mallis*, 435 U.S. 381, 386–87, 98 S.Ct. 1117, 1120–21, 55 L.Ed.2d 357 (1978) (rules regarding appeals from separate entry of judgment should be interpreted in "common-sense" fashion).

have believed that probable cause existed to arrest Krause.

### A. *The Standard for Granting Judgment N.O.V.*

■ We may overturn the denial of a motion for j.n.o.v. only if there is but one conclusion that a jury could have reached when the weight of the evidence and credibility of the witnesses are not taken into account. *See Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502, 508 (2d Cir.1989); *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir.1988). In this case, we are presented with the question whether the evidence supports a finding that Bennett was entitled to qualified immunity as a matter of law.

### B. *The Standard for Finding Qualified Immunity*

■ State officials are qualifiedly immune from suits for civil damages alleging violations of federal law. However, because their immunity is only qualified, their conduct is not always shielded. A factual inquiry may be necessary to determine if immunity is available. *See, e.g., Lawson v. Abrams*, 863 F.2d 260, 262–63 (2d Cir.1988). Nevertheless, Bennett is correct in asserting that qualified immunity can be shown as a matter of law in some cases. *See Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987).

■ A defendant may establish a right to qualified immunity by showing that "it was not clear at the time of the official acts that the interest asserted by the plaintiff was protected by a federal statute or the Constitution;" or that "it was not clear at the time of the acts at issue that an exception did not permit those acts;" or that "it was objectively reasonable for [the officer]

to believe that his acts did not violate [plaintiff's] rights." *Robison v. Via*, 821 F.2d 913, 920–21 (2d Cir.1987); *see Anderson v. Creighton*, 483 U.S. at 639–41, 107 S.Ct. at 3038–40; *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982); *Neu v. Corcoran*, 869 F.2d 662, 665 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989). Because the alleged constitutional violations of which Krause complains involve rights that were clearly established at the time of his arrest, and to which no exceptions are applicable, only the third of these methods is available to Bennett.

■ Specifically, a police officer is entitled to qualified immunity from section 1983 claims charging the officer with unconstitutional arrest if the officer's conduct was "objectively reasonable." *Malley*, 475 U.S. at 345, 106 S.Ct. at 1098. "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." *Id.* at 344–45, 106 S.Ct. at 1098 (citation omitted).

■ Thus, Bennett is entitled to qualified immunity if it was objectively reasonable for him to believe that his actions did not violate Krause's rights. *See Eng v. Coughlin*, 858 F.2d 889, 895 (2d Cir.1988); *Robison*, 821 F.2d at 921. If this result is the only one supported by all the evidence adduced at trial, *i.e.,* if Bennett was entitled to immunity as a matter of law, he was entitled to judgment n.o.v.[3]

### C. *Bennett's Failure to Object to the Charge and Special Verdict Form*

Krause contends that because Bennett did not object either to the charge or to the special verdict form, he cannot now raise as error the submission of the question of

---

**3.** Although the question of qualified immunity is usually raised through a motion for summary judgment, no such motion was made in this case. The absence of a motion for summary judgment is not a defect, however, as the absence of a motion for a directed verdict would be. While the issue in this case certainly could have been raised in a motion for summary judgment, there is no reason why it was not

proper to raise it in a motion for a directed verdict or j.n.o.v. *See, e.g., Stubbs v. Dudley*, 849 F.2d 83, 85 (2d Cir.1988) (after prior rejections by court of defense of qualified immunity, defendant made motion for j.n.o.v. based in part on qualified immunity defense), *cert. denied,* —— U.S. ——, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989).

reasonableness to the jury. Krause's argument fails for two reasons.

 First, Bennett clearly indicated in letters to the district court that he did not believe that the jury should consider the question whether his actions were objectively reasonable. Instead, Bennett argued that this question was one of law and should be decided by the district judge. When the district judge nevertheless stated that he intended to submit this question to the jury, Bennett submitted a requested verdict form in an attempt to have an impact on the form's final wording. That Bennett attempted to mold the special verdict form to his liking, within the parameters set by the district judge, cannot be held against him. It was clear that Bennett thought the issue should be decided by the judge and that he communicated this belief to the judge. The policy behind Fed. R.Civ.P. 51, which requires a party to object to portions of the jury charge with which he or she disagrees, is to "alert the trial judge to *errors* in the charge so they can be corrected before the jury retires." *Hegger v. Green*, 646 F.2d 22, 27 (2d Cir. 1981). In this case, the judge was so alerted and the purpose of the rule was served. Any attempt by Bennett to submit proposed questions in accordance with the judge's statements did not waive Bennett's opposition to the district court's decision to submit the question of reasonableness to the jury in the first place.

 Second, although Bennett did not object to the charge given to the jury on the question of reasonableness or to the special verdict form that ultimately was submitted to the jury, that failure is not fatal to his appeal. Bennett did raise the issue below in motions for a directed verdict and j.n.o.v., as well as in letters to the court relating to the jury charge and verdict form. Furthermore, the question presented by Bennett's motions is one of law, *see infra*, and is not one that is confined to the particular factual circumstances of this case. Therefore, although Bennett did not comply with the letter of Rule 51, his actions were sufficient to preserve his objection for review. *See City of St.*

*Louis v. Praprotnick*, 485 U.S. 112, 116–25, 108 S.Ct. 915, 920–24, 99 L.Ed.2d 107 (1988).

## D. *Application of the Legal Standards to This Case*

Under the circumstances as revealed by the evidence developed in the district court, we believe that Bennett is qualifiedly immune from suit as a matter of law, and therefore that his motion for j.n.o.v. should have been granted.

Krause was charged with criminal possession of stolen property in the third degree, N.Y. Penal Law § 165.40 (McKinney 1975) (amended 1986). The elements of this crime are that a person "knowingly possesses stolen property, with intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof." *Id.*

 Krause's argument on appeal focuses on the reasonableness of Bennett's belief that Krause *knowingly* possessed stolen property. To a lesser extent, Krause also questions whether the information presented to the town justice who signed the arrest warrant was sufficient to infer that Krause possessed the requisite knowledge. We conclude that the information presented to the town justice was sufficient to establish that probable cause existed and that it was objectively reasonable, as a matter of law, for Bennett to believe that Krause intended to possess stolen property.

The warrant did indicate that Krause possessed the sign "knowingly." Preprinted on the information submitted to the town justice by Trooper Bennett were various mental states, including the term "knowingly." Each of the other mental states was crossed out, leaving only the word "knowingly" to describe Krause's state of mind. As the town justice signed the warrant based, in part, on this information, we presume that he was cognizant of both the elements of the crime charged and the actual terms of the information, which included the word "knowingly." We therefore reject the assertion that the informa-

tion presented to the town justice was insufficient.

Krause also asserts, however, that Bennett himself had no reason to believe that Krause's possession was knowing, and therefore that Bennett did not have probable cause to arrest him. This argument is also without merit.

First, we note that Bennett was not presented with a circumstance in which intent could be inferred from mere possession of stolen goods. Such an inference can only be made when the goods have been recently stolen, *see People v. Miller*, 114 A.D.2d 863, 863–64, 494 N.Y.S.2d 899, 900 (2d Dep't 1985) (mem.), *appeal denied*, 67 N.Y.2d 763, 500 N.Y.S.2d 1036, 491 N.E.2d 293 (1986), but seventeen years is far too long a period of time to support an inference of intent, *see People v. Rolland*, 128 A.D.2d 650, 651, 512 N.Y.S.2d 894, 895 (2d Dep't 1987) (mem.) (six months after theft too long to presume defendant knowingly possessed stolen property).

Additionally, it is clear that to have convicted Krause of possession of stolen property, the People would have had to prove that Krause had actual knowledge that the property was stolen. The factfinder could not rely on a presumption that possession of a stolen sign implied knowledge of its origin. Nor could it presume that a negligent inquiry as to the antecedents of the sign, or a failure to inquire as to the antecedents of the sign, constituted knowledge. *See, e.g., People v. Milea*, 72 A.D.2d 902, 902–03, 422 N.Y.S.2d 175, 176 (3d Dep't 1979) (mem.); *People v. Nowakowski*, 39 A.D.2d 621, 621, 331 N.Y. S.2d 64, 65 (3d Dep't 1972) (mem.); *People v. Price*, 19 A.D.2d 730, 730, 242 N.Y.S.2d 379, 380 (2d Dep't 1963) (mem.), *cert. denied*, 390 U.S. 908, 88 S.Ct. 823, 19 L.Ed.2d 874 (1968). In a similar vein, where a defendant has given a "full explanation" of the story behind his or her possession of certain property, and there is no evidence to impugn that story, a conviction cannot be had for possession of stolen property, as the essential element of knowledge has not been proved. *See Milea*, 72 A.D.2d at 903, 422 N.Y.S.2d at 176.

However, the question presented to the district court was not whether Krause could have been convicted of possession of stolen property, but whether probable cause existed for Bennett to believe that Krause had committed that crime. Even if Krause had actually gone to trial and been acquitted, that result would have no bearing on the determination of whether probable cause existed to arrest him. *See Warren v. Byrne*, 699 F.2d 95, 98 (2d Cir.1983). We believe that the circumstances as known to Bennett at the time of the arrest and the application for the warrant were sufficient to support a finding of probable cause.

"In general, probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir.1989). *Calamia* involved a section 1983 suit containing an allegation that the plaintiff had been arrested without probable cause. This assertion was founded on the lack of an independent investigation by the police officer involved, who relied on the information revealed in an investigation by an A.D.A. as the basis for his arrest warrant application. The officer's arrest was held to be based on probable cause. In *Calamia*, as here, the A.D.A. working on the case recommended that a prosecution be initiated. Likewise, in both the case before us and in *Calamia*, there is no real dispute about what information was known to the officer in charge of the investigation. It is clear here that at the time he applied for a warrant to arrest Krause, Bennett knew that Krause possessed the sign, that the sign had been stolen, that the sign had identification markings on the back of it and that Krause said he did not know it was stolen. This information was sufficient to support a finding of probable cause. While traffic signs are not contraband, it is commonly known that they are often stolen from roadsides, and that they are not routinely

acquired by the general public.[4] The sign in question was obviously neither a replica nor a discarded sign; it appeared to be in good condition and was made of metal, not of cardboard or some other substance that would be appropriate for copies or decorative signs. Furthermore, this sign had figures on the back that indicated that someone had marked the sign for identification purposes.

The only element of the crime for which Krause alleges insufficient evidence existed is his state of mind. However, it is impossible for a police officer to ascertain with any degree of certainty that a person for whom a warrant is sought possessed a particular state of mind at the time of the commission of some act. While in this case the element of knowledge was essential to a finding that Krause had committed the crime charged, Bennett was entitled to rely on the implications of the information known to him in assessing whether Krause possessed this knowledge. *See Floyd v. Farrell*, 765 F.2d 1, 5–6 (1st Cir.1985) (facts leading to reasonable belief that arrestee knew car was stolen supported finding that officer reasonably believed that probable cause to arrest existed). In this case, based on the facts detailed above, including Krause's Bing Miller explanation, we believe that the evidence supported an inference of knowledge and thus of probable cause.

We believe that, as a matter of law, an "officer of reasonable competence would have requested the warrant" in question here. *Malley*, 475 U.S. at 346 n. 9, 106 S.Ct. at 1098–99 n. 9. In *Criss v. City of Kent*, 867 F.2d 259 (6th Cir.1988), the Sixth Circuit observed that traffic signs found in a private living room that were either municipal property or "remarkable replicas," *id.* at 263, supported a finding that probable cause existed to arrest for the crime of receipt of stolen property, a person who lived in the apartment and who had constructive possession of the signs, despite the person's innocent explanation of the signs' presence. Similarly, the appearance of the stop sign, the placement of the sign, and Krause's admission of possession, support a finding that Bennett had an objectively reasonable belief that probable cause existed to make the arrest of Krause. Because it cannot be said that Bennett's request for a warrant was objectively unreasonable, he is entitled to immunity as a matter of law.

It is immaterial that a more thorough investigation by Bennett might have revealed that Bing Miller really did find the sign in his house when he moved into it. Even if true, this information would not have indicated that the sign was not stolen initially or that Krause did not know that possession of the sign was illegal. It bears repeating that probable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful. "It is therefore of no consequence that a more thorough or more probing investigation might have cast doubt upon" the situation. *United States v. Manley*, 632 F.2d 978, 984 (2d Cir.1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981).

We note that neither Bennett nor Krause elicited testimony or introduced evidence at trial to prove what an objectively reasonable police officer would consider sufficient to show probable cause in the situation Bennett faced when he applied for the warrant to arrest Krause. This oversight does not call for a remand for a new trial, however. On the facts in this case, we are confident that a reasonable police officer in Bennett's situation would, as a matter of law have believed that probable cause existed to arrest Krause.

---

**4.** Krause argued that traffic signs can be purchased by the general public, and produced a catalog to show this. Nevertheless, the catalog is of little probative value, as no evidence was introduced to show the number or frequency of sales of such signs. In fact, the testimony at trial indicated that the catalog may have been directed not to the general public, but to persons in charge of traffic patterns at airports. We are unconvinced that stop signs as used by local governments are both readily and legally available. Furthermore, the identification number on the back of this particular sign strongly suggested that the sign was government property.

A contrary holding would put an unfair burden on law enforcement officers. It would be unreasonable and impractical to require that every innocent explanation for activity that suggests criminal behavior be proved wrong, or even contradicted, before an arrest warrant could be issued with impunity. *See Criss*, 867 F.2d at 263 ("[t]o hold otherwise would be to allow every suspect, guilty or innocent, to avoid arrest simply by claiming 'it wasn't me' "). It is up to the factfinder to determine whether a defendant's story holds water, not the arresting officer. *Cf. United States v. Malsom*, 779 F.2d 1228, 1233 (7th Cir.1985) (question of whether necessary criminal intent is established is for factfinder). Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence.

This is not to say that Krause does not have a valid grievance against Trooper Bennett which might be recognized under some other theory of law. As to that, we make no decision. We simply determine that Bennett's actions were not objectively unreasonable for purposes of. this section 1983 action. We cannot say that the warrant application in this case lacked any "indicia of probable cause," *Malley*, 475 U.S. at 344–45, 106 S.Ct. at 1097–98, or that Bennett otherwise violated clearly established rights of Krause. Whether Krause has a state cause of action for malicious prosecution is not before us. We decide only that Bennett is immune from Krause's section 1983 claim.

## CONCLUSION

State Trooper Bennett is entitled to qualified immunity as a matter of law. Krause has shown no support for his contention that it was objectively unreasonable for Bennett to believe that probable cause existed to make the in question arrest or that Bennett's actions were motivated by retali-

ation. We vacate the judgment of the district court and remand with instructions to dismiss the action.

OAKES, Chief Judge (dissenting):

Central to the majority's position is its assumption that a stop sign is uniquely government property, so that a reasonable person could infer that anyone who possesses a stop sign must know that the sign is stolen. The assumption, however, involves appellate factfinding, and is contrary to the evidence in this record. It is only with the help of that factfinding that my colleagues have not only overturned a general verdict in favor of Michael Krause, but also a special verdict that Trooper Bennett did not reasonably conclude that there was probable cause to believe that Krause had committed the crime. I therefore dissent.

First, as to the appellate factfinding: The opinion says that "[w]hile traffic signs are not contraband, it is commonly known that they are often stolen from roadsides, and that they are not routinely acquired by the general public." Footnote 4 of the opinion qualifies this statement by referring to the evidence in the record that traffic signs can be purchased by the general public, as was shown by a catalog produced at trial (Exhibit 13). The footnote goes on to say that "the catalog is of little probative value, as no evidence was introduced to show the number or frequency of sales of such signs." This implies that, absent such evidence, sales to the public are presumed to be so negligible in quantity that it would be unreasonable to expect a stop sign on someone's wall to be anything other than stolen. The footnote then adds, "We are unconvinced that stop signs as used by local governments are both readily and legally available" and that "the identification number on the back of this particular sign strongly suggested that the sign was government property" (painted, rather amateurishly, on the back of the sign was "90 M 11/14/66").[1]

1. Trooper Bennett testifying in respect to the catalog said, "It indicates that it is for airport

control signs." This was, however, an unresponsive answer to the question(s) asked. The

Were this dissent to engage in the same appellate factfinding it would come to quite different conclusions. Of course stop signs are readily available for purchase by members of the public. They are purchased all the time. On a trip from my home to my office in Brattleboro, Vermont, one passes five privately owned stop signs exactly like municipal stop signs—six, if one counts the United States Government as a private owner. They are purchasable at sign companies such as the Hampden (Massachusetts) Sign Co. Some are bought by individual businesses which have a lot of traffic, such as the Brattleboro Daily Reformer, for use in driveways; others are purchased by shopping mall owners for use where a driveway opens onto a road without a traffic light. The price of a 30″ by 30″ stop sign, as was involved in this case, is $35 or $40 when the signs are purchased in small quantity.

But suppose we address ourselves to the evidence in the case rather than going dehors the record. Trooper Bennett, as he testified, knew "that it was necessary for a person to know that the property was stolen" for the person to be convicted. He also learned that the sign had been missing since 1967, almost seventeen years before he had discovered the sign in Krause's garage. Bennett was also well aware that Krause had said he was given the sign some years before by one "Bing" Miller, who had found it hanging in his basement recreation room when he purchased his home. But like my colleagues, the trooper said he was proceeding on the assumption that all stop signs are official, and are purchased and placed only by a municipality, county, or state. He did not ask anyone whether or not signs could be purchased privately because it was his belief "that they could not be." Yet cross-examination of Bennett with the use of the catalog identified as Exhibit 13 showed that signs like Saratoga County 90 M could be purchased privately, at a price of $50 or three for $40. Parenthetically, one would also suppose that a stop sign might be purchased from a municipality, at a yard or garage sale, or at a flea market.

Moreover, Defendant's Exhibit J in evidence was a letter from Donald Shanley, Krause's lawyer, dated July 18, 1984, to Assistant District Attorney Thomas J. McNamara which stated:

Also, it is my information that there was nothing on the sign to identify it as belonging to any person or agency. Possession of a highway sign is not illegal, per se. I believe that they can be purchased by anyone, and could be possessed legally as long as not put to an improper use. I think that that can be verified by anyone connected with a company making and selling same. I think that even the highway department will agree to the truth of the assertion.

This letter prompted the district attorney to dismiss the charges. Indeed, on cross-examination, John Miller, the Saratoga County Highway Department traffic division foreman who originally identified the stop sign in question as belonging to the county, testified that a picture in the catalog shown to Bennett was a picture of a stop sign with the same dimensions, 30″ by 30″, as the stop sign in this case.[2]

In light of the evidence that the sign in Krause's garage was stolen in 1967, that Krause claimed that he was given the sign and had had it for several years, and that both the catalog used to cross-examine Bennett and the letter from Krause's lawyer to the district attorney indicated that such stop signs could be bought by the general public, the jury specifically answered in the negative (following instructions that were not objected to) to Special Interrogatory 4: "Would a reasonably competent police officer have concluded that

question(s) asked were: "And that is an offer to the general public, can you tell? What does it indicate the price to be?"

**2.** The question asked of Miller as transcribed referred to Exhibit 14 rather than 13, the catalog. But Exhibit 14 is an affidavit containing no pictures, and Attorney Shanley subsequently referred to Foreman Miller's testimony about the catalog, so either the transcript is erroneous or the attorney mistook 14 for 13 when he asked Miller the question. There is no doubt that Miller was actually shown the catalog that was shown to Trooper Bennett.

there was probable cause to believe that the plaintiff had committed the crime of 'Criminal Possession of Stolen Property?'" The reason that the jury answered negatively seems perfectly obvious: Krause could not have known that "90 M" with a date meant that the sign necessarily was, or even at some time had been, municipal or county property. Indeed, during its deliberations the jury wrote a note specifically asking the question,

> Referring to Question 4 [quoted above] may we have the testimony of Mr. Krause and Trooper Bennett about Bing Miller's new address and phone number, to determine if Trooper Bennett had the probable cause to disregard Mr. Bing Miller and feel that Mr. Krause did commit the crime of "Criminal Possession of Stolen Property." Also the testimony about the 2 phone calls to Bennett by Krause.

Accordingly, in all probability the jury believed Krause's testimony that he had indeed telephoned Bennett with Bing Miller's address and telephone number after ascertaining that Bing Miller's real name was Milton Miller. (Incidentally, Bing Miller and Krause had been fellow workers for thirty years.) And the jury, aware through instruction and closing argument that knowledge was an element of the crime, may well have felt that Bennett should have contacted Miller before he arrested Krause.[3]

Moreover, what of the punitive damages that the jury found—$25,000 worth, reduced on remittitur to only $2,500—pursuant to the court's instruction that the jury might award special damages only if it found that Bennett acted "maliciously or wantonly or oppressively"? Under the instructions given to define these three terms, the jury must have found either that Bennett acted "out of ill will or spite or grudge" (retaliation for the suit against Trooper Penny?), or that he acted in a "reckless or callous disregard of or in disregard to" Krause's rights, or that he violated Krause's rights with "unnecessary harshness or severity and by the use or ability of authority or power."

Picture it. A man is cooking goulash with his woman friend at his home on a rural road in a rural town, Half Moon, New

---

**3.** There is, I suppose, another alternative that the jury could have had in mind even though it was not specifically charged or argued. This alternative was mentioned in the order of dismissal of the charge as filed, which was in evidence, and it was mentioned by the acting county judge who signed the order, as well as by the assistant district attorney, Thomas McNamara, who consented to dismissal. The charge was criminal possession of stolen property in the third degree (prior to the amendment of this section in 1986 to fifth degree), a Class A misdemeanor. N.Y. Penal Law § 165.40 (McKinney 1988) (statute and historical note). Under New York law, "A prosecution for a misdemeanor must be commenced within two years after the commission thereof." N.Y. Criminal Procedure Law § 30.10(2)(c)(McKinney 1981). While a sophisticated lawyer or judge might speculate that the crime of possession of stolen property is a continuing one, tolling the statute of limitations, at least where the property is concealed, the layman confronted with the question would believe—once made aware as this jury was of the statute of limitations—that the statute starts running when the property is first possessed or at least when it is displayed as openly as Krause displayed it, to all comers to his house and even, in the right light, apparently, to motorists cruising the highway. Here, moreover, the trooper might have been put on notice by the fact that the sign was replaced in 1967—almost seventeen years before, a longer time than Bennett had concededly ever known of anybody being arrested for possessing property. Moreover, Krause claimed to have been given it by Bing Miller more than two years before and the jury had heard testimony by Miller that it was in his family room in the basement from the time he bought his home in September 1976, and that he had given it to Krause in May of 1978. Exhibit J, the letter from Krause's lawyer to the district attorney pointing out that the statute of limitations for a misdemeanor was two years and that Krause had had the sign for four years, indicated the lawyer's belief that the prosecution was time-barred, and the district attorney had replied that he would have no objection to an application to the court to dismiss based upon the statute of limitations, by a letter also in evidence. On this basis the jury could have thought that a reasonably competent police officer should have known, or at least looked at the penal law and discovered, that the two-year statute of limitations would bar the prosecution of Krause. The verdict in this scenario could be explained as a warning to police officers not to arrest people for crimes when the statute of limitations has run. But because this aspect of the case was neither charged nor argued, I think we must consider this alternative purely hypothetical.

York. He has a garage which is eighty feet from the road and which is twenty-six feet deep. He keeps the garage door open because the door from the garage into the house is the only entrance which has steps; he relies on his German shepherd to warn of any visitors. Several years before he was given a stop sign worth $40 or so new by a fellow worker, and he has had the sign hanging in his garage, lo, these several years. He has even had troopers there in the garage, at the time of the prior incident involving Trooper Penny, who have paid no attention whatsoever to the stop sign. To be sure, when he hung up the stop sign after it was given to him, he glanced at the painting of "90 M 11/14/66" on the back of the sign, but it didn't mean anything to him, as it would not to most people. All of a sudden he hears the dog barking and a trooper who has pulled into his driveway inquires about the stop sign and mentions several times that it is "stolen property." The homeowner is perfectly cooperative, invites the trooper in to talk about the matter, and explains how he came into possession of the property. The trooper, in what the woman friend described as an "intimidating," "rather cocky" and "harassing" manner, keeps repeating that the sign is stolen property. Despite being told that the sign was a gift, given the name of the giver, and informed of the actual name, telephone number, and address of the giver the following day, the trooper goes ahead and swears out a warrant for a crime which he understands requires knowledge that the property was in fact stolen, a misdemeanor as to which the statute of limitations is two years,[4] the charge of which is ultimately dismissed. Harassment? I say yes; the majority demurs, saying that even if it was harassment the trooper had qualified immunity as a matter of law because stop signs are "not routinely acquired by the general public" and "this sign had figures on the back that indicated that someone had marked the sign for identification purposes."

In declining to render judgment notwithstanding the verdict, Judge Cholakis, after properly viewing the evidence in the light most favorable to Krause, concluded that the evidence was sufficient to enable a reasonable juror to arrive at this verdict. He also examined the defense of qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), *Malley v. Briggs,* 475 U.S. 335, 345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986), and *Anderson v. Creighton,* 483 U.S. 635, 638–39, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987), and concluded that the question "whether it was objectively reasonable for the defendant to believe that plaintiff had committed this crime is one of fact to be determined from the evidence presented during trial." Judge Cholakis said further that the question of qualified immunity was answered by the jury's answer to Special Interrogatory 4. Since according to the jury a reasonably competent police officer would not have believed that the plaintiff committed the crime for which he was arrested, it was not objectively reasonable (within the Supreme Court cases) for the trooper to have believed that his acts did not violate Krause's rights. I agree, and I do not see how the majority can disagree. Accordingly, I dissent.